**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

AMY DAWN JEFFRIES,

Plaintiff,

v.                                   Civil Action No. 1:12CV162
                                     (The Honorable Irene M. Keeley)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

## REPORT AND RECOMMENDATION/OPINION

Amy Dawn Jeffries ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security

Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of

the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision

on cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on March 12, 2009, alleging disability since

December 8, 2008, due to "PTSD, diabetes, high blood pressure, right and left leg pain, left hand

pain, high cholesterol, high triglycerides, kidney problems, anxiety, back pain, numbness in hand,

headaches" (R. 183-95, 219, 223). The state agency denied Plaintiff's applications initially and on

reconsideration (R. 93-96). Plaintiff requested a hearing, which Administrative Law Judge Karl

Alexander ("ALJ") held on January 26, 2011, and at which Plaintiff, represented by counsel, Montie

VanNostrand, and Larry Ostrowski, a vocational expert ("VE") testified (R. 47-91). On March 31, 2011, the ALJ entered a decision finding Plaintiff was not disabled (R. 26-46). Plaintiff filed a request for review with the Appeals Council (R. 25). On September 7, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-7).

## II. STATEMENT OF FACTS

Plaintiff was born on December 8, 1971, and was thirty-nine (39) years old on the date of the administrative hearing (R. 39, 47). She graduated high school (R. 39). Plaintiff's past relevant work included insurance salesperson and manager (R. 224, 526).

Plaintiff was diagnosed with depression and panic disorder on November 30, 2000, by Dr. Scattaregia after she reported she experienced "extreme anxiety and panic . . . during the course of her daily routine." Dr. Scattaregia prescribed Buspar (R. 690).

Plaintiff's July 22, 2004, renal ultrasound was normal (R. 271).

Plaintiff presented to the emergency department at Stonewall Jackson Hospital on August 20, 2004, for treatment of injuries sustained in a motor vehicle accident. Plaintiff was an unrestricted, front-seat passenger. She reported chest pain, sternal bruising, and calf laceration. Plaintiff reported she medicated with metformin, Actos, Singulair, Advair, Diovan, and Zoloft (R. 280). Plaintiff's chest x-ray was "limited due to body habitus." Plaintiff's left knee x-ray was normal. Her cervical spine x-ray was "[v]ery limited . . . due to body habitus" (R. 287).

Plaintiff's August 21, 2004, CT scan of her head, maxillofacial, cervical spine, and abdomen showed the following: "1. No evidence of intracranial hemorrhage, although some images are degraded by motion. 2. No fracture/subluxations of the upper cervical spine. Images through the

lower cervical spine are degraded by artifact, as described above. Please clinically correlate. 3. Equivocal evidence for anterior subluxation of the left mandibular condyle. Motion artifact through this region can accentuate this appearance. Please clinically correlate. 4. No evidence for solid organ/bowel injury. 5. Bilateral renal cysts. 6. Foreign bodies within the superficial soft tissues in the left frontal orbital" (R. 275-76).

Plaintiff was transferred to Ruby Memorial Hospital (R. 285). Her August 21, 2004, left femur x-ray showed a laceration but no fracture or dislocation; the left tibia/fibula x-ray showed laceration but no fracture; the CT scan of her abdomen and pelvis showed "multiple bilateral renal cysts" and no acute posttraumatic change to the abdomen or pelvis; the CT of her facial bones showed no fracture, a chipped right incisor, and overlying debris over her scalp and forehead; the cervical spine CT scan showed no evidence of acute posttraumatic change; the brain CT showed no acute posttraumatic changes; and the chest x-ray showed no acute posttraumatic changes (R. 345-52).

Dr. Zuberi completed a psychiatric consultative examination of Plaintiff on August 21, 2004. Plaintiff had tested positive for marijuana (R. 424). Plaintiff stated she had been diagnosed with depression and treated it with Zoloft. She stated she "[felt] ofended (sic) by being seen by psychiatry" (R. 272). Plaintiff informed Dr. Zuberi she had used marijuana two (2) or three (3) times a month and that she had stopped using marijuana two (2) weeks earlier. Dr. Zuberi noted Plaintiff became "'upset' when confronted about marijuana use." (R. 272). Dr. Zuberi noted Plaintiff smoked one (1) package of cigarettes every three (3) days (R. 424). Plaintiff's thought process was normal. She had a full fund of knowledge. Her judgment and insight were fair. Her affect was "upset." Plaintiff stated she was not interested in out-patient mental health treatment (R. 425).

Plaintiff's August 22, 2004, left hand x-ray showed soft tissue swelling and an oblique

fracture of the third metacarpal. Her right shoulder x-ray was "grainy," the images were "limited," and no fracture was seen (R. 342-44).

Dr. Ryu performed an open reduction internal fixation of Plaintiff's left long finger on August 23, 2004. She was discharged on August 24, 2004 (R. 403, 405-06).

On September 1, 2004, Dr. Jenkins examined Plaintiff's left knee laceration. She had no new complications. Her range of motion was 0-90 which could be "improved with physical therapy." Her leg was neurovascularly intact (R. 339).

Plaintiff's September 4, 2004, chest x-ray showed no acute processes (R. 338).

The stitches were removed from Plaintiff's left knee laceration on September 14, 2004. Dr. Jenkins noted the incision "look[ed] good" and that Plaintiff was doing "fairly well." He ordered therapy to improve her ankle and knee ranges of motion (R. 334).

On September 14, 2004, Dr. Veale examined Plaintiff relative to the open reduction internal fixation of her long left finger, removed the splint, and applied a short-arm cast (R. 335).

Plaintiff's September 14, 2004, thoracic spine CT scan showed no evidence of fracture or malalignment of her vertebral column and minimal anterolateral endplate osteophyte (R. 336).

On October 5, 2004, Plaintiff told Dr. Veale that she was "doing very well" relative to her open reduction internal fixation of the left long finger. She had no "significant" pain. There was a "palpable foreign body" at the base of her thumb on her right hand; the doctor suspected it was glass. Dr. Veale removed Plaintiff's cast; her incision was well healed. Her neurovascular examination was intact. Plaintiff's examination was unremarkable. The x-ray of the left hand showed a healing fracture of the middle finger; two screws were secure. Dr. Veale instructed Plaintiff to begin therapy for her left hand. Dr. Veale noted Plaintiff would have to have the foreign

body removed from her right hand (R. 330-33).

Plaintiff's October 6, 2004, myocardial perfusion scan was normal (R. 329).

Physician Assistant Fred Polanda and Dr. Riggs completed a post motor-vehicle-accident neurological examination of Plaintiff on October 14, 2004. Plaintiff reported that, during the accident, a "heavy juice can flew from the back of the car" and hit her on the head. Plaintiff stated she "smashed" her knees, thighs, and hands on the dashboard during the accident. Plaintiff stated she experienced "severe leg numbness" in her thighs and "numbness around her chin." Plaintiff reported "memory problems, difficulty with thinking and coming up with the right word . . . ." Plaintiff stated she experienced "burning pain between her scapula" and severe low back pain. Plaintiff smoked one-half (½) package of cigarettes per day. Upon examination, Plaintiff was alert and obese. Her vision, heart, lungs, language, speech, and muscle tone were normal. She was oriented. Her memory, attention, and knowledge were all normal. Her cranial nerves were intact. Her finger-to-nose coordination was symmetric. Her stretch reflexes were symmetric and her toes went down to plantar stimulation. She favored her left leg when walking. She had decreased vibratory on her feet and decreased pinprick sensation to both thighs (R. 326).

Dr. Hubbard found Plaintiff's left knee laceration was "nearly completely healed" on November 3, 2004. Dr. Hubbard found there was "no reason [for Plaintiff] not to be able to return back to work, probably within the next 3 weeks" (R. 324).

Plaintiff's November 17, 2004, MRI of her lumbar spine was "unremarkable." It showed "some hypointense signal within the thecal sac," which was likely related to the cerebral spinal fluid flow. It showed no disk herniations, spinal stenosis, or foraminal narrowing (R. 323).

Dr. Smalley examined Plaintiff's left middle finger on December 3, 2004, for metacarpal

5

fracture.  She was "doing quite well."  She had "some residual pain surrounding the fracture," a proximal interphalangeal joint ganglion, which was "bearable," and a foreign body at the base of her right thumb.  She was scheduled to have it removed (R. 322).

Plaintiff's January 14, 2005, brain MRI showed no abnormalities.  Her cervical spine MRI showed no evidence of a disc bulge, herniation, or spinal canal stenosis (R. 305-06, 375-78).

Glass was removed from Plaintiff's right hand on January 24, 2005 (R. 371-72).

Plaintiff's January 31, 2005, electromyogram showed bilateral carpal tunnel syndrome with no polyneuropathy (R. 368).

Plaintiff's February 23, 2005, abdominal CT scan showed bilateral renal cysts (R. 490).

On May 3, 2005, Marc W. Haut, Ph.D., completed a neurological examination of Plaintiff.  Dr. Haut found Plaintiff met the criteria for posttraumatic stress disorder ("PTSD") caused by the motor vehicle accident and major depressive disorder (R. 479).  Dr. Haut found Plaintiff's PTSD needed to be "aggressively treated."  He recommended medication and psychotherapy (R. 480).

Plaintiff was positive for cannabinoid (THC) May 23, 2005 (R. 353, 358).

Dr. Moore found, on May 27, 2005, Plaintiff's vision was 20/20 in each eye (R. 321).

Dr. Shamma'a noted Plaintiff's July 6, 2005, colonoscopy was normal (R. 361).

On October 12, 2005, Dr. Grey, examined Plaintiff relative to her "memory problems."  He found Plaintiff had good concentration.  She was alert and oriented, times four (4).  Her mental exam was "27/30."  Her mood and affect were appropriate.  She was "not anyway upset."  Her comprehension was normal; her thought process was goal oriented.  Dr. Grey diagnosed "questionable" PTSD.  He found Plaintiff had "been doing fairly well" with Cymbalta.  She had more energy. Dr. Grey noted Plaintiff's symptoms were "mostly related to depression" (R. 503-04).

Dr. Grady completed a consultative examination of Plaintiff on October 14, 2005.  Plaintiff

reported left knee pain. Dr. Grady found Plaintiff was positive for "some crepitus" but no ligamentous instability. He recommended Plaintiff get a MRI of her left knee. Plaintiff complained of neck pain. Dr. Grady found "some myofascial tenderness in the cervical region and some decreased range of motion of her neck." She had no cervical radiculopathy. Dr. Grady noted the MRI of her cervical spine was normal. Plaintiff informed Dr. Grady that electrodiagnostic testing showed she had carpal tunnel. Dr. Grady found she had no radiculopathy therefrom. Plaintiff reported she had "problems with anxiety, memory and concentration" (R. 460). Dr. Grady noted Plaintiff's neurologic examination was "nonfocal" and deferred a psychiatric diagnosis. As to Plaintiff's hands, Dr. Grady found "slightly decreased range of motion of the right hand" and no "residual problems" from her left long finger fracture (R. 461). Dr. Grady found she had a seven (7) percent whole-person impairment (R. 462).

On November 22, 2005, Dr. Mishra found it was "unlikely" Plaintiff had fibromyalgia (R. 487).

On December 9, 2005, Plaintiff told her mental health counselor that she was "grouchy" and "angry" and she wanted the Department of Behavioral Medicine and Psychiatry to assist her "[with] disability" (R. 495).

Dr. Agas diagnosed Plaintiff with diabetes, hypertension, and arthritis on August 2, 2007. He prescribed Actos, Xanax, Ultram, Diovan, Elavil, and Glucophage (R. 518).

Dr. Agas diagnosed Plaintiff with hypolipidemia, hypertension, and diabetes on October 11, 2007. He prescribed Actos, Zyrtec, Diovan, Xanax, Elavil, Glucophage, and Crestor (R. 516).

On March 20, 2008, Plaintiff presented to Dr. Agas with left-leg pain. Dr. Agas diagnosed hypolipidemia, hypertension, diabetes, and osteoarthritis. He prescribed Xanax, Actos, Glucophage,

Crestor, Cymbalta, and Diovan (R. 514).

On October 10, 2008, Plaintiff was examined by Dr. Agas, who diagnosed hypertension, diabetes, and urinary tract infection. Plaintiff stated she was "stressed." He prescribed Actos, Cymbalta, Elavil, Diovan, Vicodin, Xanax, Crestor, Tricor, and Glucophage (R. 512).

On May 5, 2009, Larry J. Legg, M.A., a psychologist, completed a Mental Status Examination of Plaintiff. Plaintiff stated she quit her job in December 2008, due to her medical condition. Mr. Legg noted Plaintiff had listed PTSD, diabetes, hypertension, bilateral leg pain, left hand pain, hypolipidemia, "kidney problems," anxiety, back pain, hand numbness, and headaches as alleged conditions. Plaintiff stated she was diagnosed with PTSD in Morgantown. She described her symptoms as nightmares, not "lik[ing] to drive," and not leaving the house "much." Mr. Legg found Plaintiff did not "report enough of the symptoms of avoidance of stimuli associated with the trauma or increased arousal to make a diagnosis of posttraumatic stress disorder at this date" (R. 525). As to anxiety, Plaintiff stated it "started in about 2002." She said she was nervous, had a stressful job, had been prescribed Zoloft, and had experienced "[s]everal family member[]" deaths. Plaintiff quit her job because she "'just couldn't take it.'" She moved to Florida for nine (9) months and did not receive any mental health treatment during that time. When she moved back to West Virginia, she resumed working and began medicating with Xanax. She was the district manager for an insurance company. She "'just went off and quit in December.'" Plaintiff reported that, during the past thirty (30) days, she had been depressed and anxious, had poor concentration and memory, had average appetite, and had a loss of interest in activities (R. 526).

Mr. Legg reviewed Dr. Grey's September 30 and October 12, 2005, medical records. He noted Plaintiff had never been hospitalized for any psychiatric or psychological reasons. She received

8

outpatient counseling for a brief time after her 2004 motor vehicle accident. Plaintiff's mental health medications had been "largely . . . prescribed and managed by her primary care physicians" (R. 526).

Plaintiff stated she had last been examined by Dr. Agas in October, 2008 (R. 526). She medicated with metformin, Actos, Cymbalta, Diovan, Crestor, Tricor, alprazolam, amitriptyline, ibuprofen, hydrocodone, and albuterol inhaler. Plaintiff smoked one (1) package of cigarettes and drank several cups of caffeinated coffee each day (R. 527). Plaintiff reported she drank alcohol every two (2) or three (3) months. Plaintiff reported she had no past or recent drug use. Plaintiff reported she had one (1) semester of college credit; she had worked as a salesperson, sales manager, and district manager for an insurance company (R. 527).

Upon examination, Mr. Legg found Plaintiff was appropriately dressed and groomed. She was motivated, cooperative, and polite (R. 527). Her speech, thought process and content, stream of thought, perception, psychomotor behavior, judgment, immediate memory, remote memory, persistence, and pace were within normal limits. She was oriented, times four (4). Her mood was euthymic and her affect was broad. Her insight was good. She had no suicidal or homicidal ideations. Plaintiff's recent memory was severely deficient; she "claimed she could recall only one of the four words given." Her concentration was mildly deficient, based on a score of six (6) on the WAIS-III Digit Span subtest. Plaintiff's social functioning was within normal limits (R. 528).

Plaintiff stated she had two (2) "close girlfriends," one of whom was dying. She got along well with her family members and boyfriend. She visited family and friends once or twice a week. She shopped from "time to time." She enjoyed taking care of flowers and fish. Plaintiff rose at 7:00 a.m.; she retired between 10:00 p.m. and midnight. She prepared breakfast for her boyfriend and packed his lunch. She returned to bed if she had a headache or experienced pain. If not, she smoked,

drank coffee, and "'piddle[d] around the house.'" She occasionally sat on the porch. She prepared dinner. She watched television (R. 528).

Mr. Legg diagnosed major depressive disorder, recurrent and moderate, and anxiety disorder, not otherwise specified ("NOS") (R. 528).

Plaintiff's May 6, 2009, lumbar spine x-ray showed minor degenerative changes (R. 531).

Dr. Sabio completed a consultative examination of Plaintiff on May 13, 2009. Dr. Sabio found Plaintiff was morbidly obese. She was alert as to time, place, and person (R. 547). Her gait was normal; she used no ambulatory aids; she was stable at station. Her hearing and vision were normal. Plaintiff was five (5) feet, three (3) inches tall; she weighed two-hundred, seventy-six (276) pounds. Plaintiff's HEENT, neck, cardiovascular, chest, abdomen, extremity, and spine examinations were normal (R. 548). Plaintiff's cervical spine lateral rotation range of motion was eighty (80) degrees left and right; her extension was forty (40) degrees. Her straight-leg raising test was ninety (90) degrees, bilaterally, in both the supine and sitting positions. Lumbar spine flexion was ninety (90) degrees. Plaintiff's left knee flexion was one-hundred (100) degrees on the left and one-hundred-twenty (120) degrees on the right; her extension was zero (0) degrees, bilaterally. Her cranial nerves were grossly normal. Her sensory function was intact throughout. Her motor strength was 5/5 in the upper and lower extremities, bilaterally. Plaintiff's deep tendon reflexes were normal. She could walk on her heels and toes. She could not walk heel to toe in tandem. She could not stand on either leg. She could squat only halfway. Fine manipulation movements were normal. Dr. Sabio diagnosed degenerative arthritis of the knees, hypertensive cardiovascular disease, uncontrolled diabetes, PTSD, and gastroesophageal reflux disease ("GERD") (R. 549).

On May 13, 2009, Philip E. Comer, Ph.D., completed a Psychiatric Review Technique of

Plaintiff. He found Plaintiff's major depressive disorder, moderate and recurrent, was an affective disorder (R. 532, 535). Plaintiff's anxiety disorder was anxiety, NOS (R. 532, 537). Dr. Comer found Plaintiff's impairments were not severe (R. 551). He found Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (R. 542).

Donna Morgan, who completed a Physical Residual Functional Capacity Assessment of Plaintiff on May 28, 2009, found the following: Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited. Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. Plaintiff had no manipulative, visual, or communicative limitations. Plaintiff should avoid concentrated exposure to extreme cold. Plaintiff's exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards was unlimited. Plaintiff was partially credible (R. 552-59).

On June 30, 2009, Plaintiff presented to Webster County Memorial Hospital Clinic to establish care with a doctor. She weighed two-hundred, seventy-six (276) pounds. Plaintiff stated she had diabetes, hypertension, hyperlipidemia, anxiety, chronic back pain, bronchitis, and right upper extremity neuropathy (R. 563). Plaintiff stated she tolerated her medications without any side effects; she no longer medicated with Lortab; and she took ibuprofen. Upon examination, Plaintiff's back was tender and she was obese. Laboratory tests were ordered. She was "strongly encouraged" to diet and exercise. She was prescribed Doxycycline and Depomedrol (R. 564).

Plaintiff was examined by a doctor at Webster County Memorial Hospital Clinic on July 28,

2009. She reported she had not been taking medication because she had no insurance coverage. She complained of left knee and back pain. Her neck was supple; she was obese; her extremities were normal; she had palpable tenderness in her thoracic spine and low back; she had pain in her left knee. She was prescribed Ultram. She was encouraged to diet (R. 591).

Plaintiff's July 29, 2009, left knee x-ray showed no acute fracture or dislocation and mild osteoarthritis at the medial joint space (R. 593).

On August 13, 2009, Dr. Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 571). Plaintiff could never climb ladders, ropes, or scaffolds. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 572). Plaintiff had no manipulative, visual, or communication limitations (R. 523-74). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, and poor ventilation. He found Plaintiff should avoid even moderate exposure to hazards. Dr. Franyutti found Plaintiff's exposure to wetness, humidity, noise, and vibration was unlimited (R. 574).

Plaintiff's August 20, 2009, renal ultrasound showed a "[c]omplicated cyst lower pole right kidney" and "[s]uspect nonobstructing stones left kidney." A CT scan was recommended (R. 578).

On August 27, 2009, Jim Capage, Ph.D., reviewed Dr. Comer's May 13, 2009, Psychiatric Review Technique and the May 18, 2009, addendum thereto, and affirmed same (R. 579).

Plaintiff presented to the Webster County Memorial Hospital Clinic on August 27, 2009, for follow-up treatment for hypertension, diabetes, hypercholesterolemia, depression, and anxiety.

Plaintiff reported she was "doing well with her current medications" and was "not having any issues." Plaintiff requested "something a little stronger than Ultram" to treat kidney stone pain. The doctor "would not put [Plaintiff] on chronic pain medicine." Plaintiff reported her "blood sugars [had] been running good at home." Plaintiff reported her anxiety was "well controlled" with Xanax. Upon examination, she was afebrile and obese. Her neck was supple and her extremity examination was normal. She was prescribed Lortab (R. 586).

On September 28, 2009, Dr. Kafka completed an examination of Plaintiff, who found Plaintiff had cervical and middle shoulder tenderness and mild crepitus in her knees (R. 580-81).

A doctor at Webster County Memorial Hospital Clinic treated Plaintiff on September 30, 2009, for chest congestion. Plaintiff stated her blood sugar had "been doing fairly well at home." She reported pain associated with kidney stones. She requested Lortab for "breakthrough pain." Upon examination, Plaintiff was afebrile, her neck was supple, and she was obese. She had "questionable flank tenderness" on her left and "some" low back pain upon palpation. Plaintiff was diagnosed with bronchitis, hypertension, diabetes, hypercholesterolemia, depression, anxiety, and nephrolithiasis. She was prescribed doxycycline, Depo Medrol, Xanax, and fifteen (15) Lortab. The doctor did not provide a refill for the Lortab prescription and informed Plaintiff that he/she was "unable to give her anymore narcotics as this was explained at her first visit." She was encouraged to exercise and instructed to stop smoking (R. 585).

Dr. Guirguis, a nephrologist, treated Plaintiff for kidney stones and cysts on October 8, 2009. Plaintiff reported nausea, vomiting, poor concentration, forgetfulness, weight loss, fatigue, weakness, sleep disturbances, bad taste in her mouth, thirst, dry mouth, numbness, change in bowel movements, and back pain. Plaintiff reported she urinated between three (3) and four (4) times per night (R.

602). Plaintiff reported she smoked from ten (10) cigarettes to one (1) package of cigarettes per day. She medicated with Xanax and tramadol (R. 603). Plaintiff's phosphorus was elevated (R. 607). Dr. Guirguis noted Plaintiff had hyperphosphatemia, multiple calcifications in her left kidney, and a kidney stone and complicated cyst in her right kidney (R. 625-29).

Plaintiff's October 15, 2009, abdominal and pelvic CT scan, which was "markedly degraded due to [Plaintiff's] body habitus," showed no evidence of obstructive uropathy and "dominant right lower pole renal cyst with additional renal hypodensities which cannot be further characterized on this limited exam" (R. 596, 728).

Dr. Guirguis examined Plaintiff on October 22, 2009 (R. 597). Plaintiff informed Dr. Guirguis she urinated three (3) or four (4) times during the day and four (4) times during the night. She had back pain, dry mouth, numbness, and tingling. She medicated with tramadol. Dr. Guirguis' examination of Plaintiff's right kidney, left kidney, and bladder were normal. She was obese (R. 622). Plaintiff's urine was yellow and clear (R. 630). Dr. Guirguis noted Plaintiff had hyperphosphatemia, multiple calcifications in her left kidney, and a kidney stone and complicated cyst in her right kidney (R. 625-29, 647). Dr. Guirguis noted Plaintiff had "lost hight (sic) suggesting underline (sic) osteopenia." Plaintiff's phosphorus was increased, calcium was within normal limits, vitamin D was decreased, "iPTH" (parathyroid hormone) was within normal limits, and "eGfr" (estimated glomerula filtration rate) was within normal limits. Dr. Guirguis "[thought Plaintiff] might be suffering from a hereditary condition called familial tumoral calcinosis." He noted Plaintiff exhibited "evidence of calcinosis in the cortica medullary junction" of her left kidney, evidence of mycroscopic hematuria, or "possible" crystals or kidney stones (R. 597). He recommended "more work up" to confirm a diagnosis. He noted that he may "have to try certain

14

therapies right away." Dr. Guirguis wrote that he will "[continue] to work with [Plaintiff and] see other members of her family who have similar condition . . . ." He found that Plaintiff could experience "pain similar to kidney stones in absence of actual stones" with this condition (R. 598).

Plaintiff presented to Dr. Guirguis on December 15, 2009, with complaints of nausea, vomiting, shortness of breath, fatigue, poor concentration, forgetfulness, sleep disturbance, back pain, arthritis, and edema. She medicated with Ultram. Plaintiff reported she urinated four (4) times per day and five (5) times per night. She experienced loin pain and dripping, she leaked urine when she coughed, and she had diarrhea for the past two (2) weeks. Plaintiff's vertebrae were tender when examined. She was obese. Dr. Guirguis provided education relative to chronic kidney disease, diet, hypertension, and voiding to Plaintiff (R. 620). He noted she was positive for hyperphosphatemia, left kidney cortica medullary calcifications, hematuria, right kidney stones, and complicated right kidney cyst (R. 633-37, 647). Dr. Guirguis ordered iron studies, CBC, urine test, and venipuncture (R. 618-19).

On January 5, 2010 , Plaintiff presented to Dr. Guirguis with complaints of back pain and fatigue. Plaintiff stated she urinated three (3) times during the night. She had blood in her urine. She released urine when she coughed. She had tingling, change in her bowel habits, and dry mouth. Dr. Guirguis' examination of Plaintiff was normal. Her right kidney, left kidney, and bladder were normal. He provided education materials for hypertension, diet, and chronic kidney disease (R. 615). Dr. Guirguis ordered iron studies and urine tests for Plaintiff (R. 613-14).

Plaintiff presented to Webster County Memorial Hospital Clinic on March 24, 2010, to establish herself as a new patient of Dr. McElwain. Dr. McElwain noted Plaintiff's nephrologist was "doing some gene therapy and gene testing" to confirm a diagnosis. She weighed two-hundred,

ninety-two (292) pounds. Her examination was normal. She had no joint swelling, edema, atrophy. Her reflexes were "plus 2 in biceps and knees." Her muscle tone was normal. She was diagnosed with hypertension, diabetes, hypolipidemia, tobacco use, chronic kidney disease, hyperphosphatemia, osteopenia, and fibrocystic breast. She was instructed to stop smoking. Blood work was ordered (R. 663-64).

On April 16, 2010, Plaintiff was given a "DHHR" physical by a doctor at the Webster County Memorial Hospital Clinic. She weighed two-hundred, eighty-five (285) pounds. Her examination was normal (R. 662).

Plaintiff reported to Dr. Guirguis on April 20, 2010, that she experienced fatigue, poor concentration, forgetfulness, dizziness, fluid retention, back pain, and arthritis. She urinated five (5) or six (6) times during the day and two (2) or three (3) times during the night. She had difficulty urinating, slow urine stream, loin pain, dripping, and leakage. Plaintiff stated she had "passed something the other day." Upon examination, Dr. Guirguis found Plaintiff was obese, and her left and right kidney and bladder were normal (R. 652). Dr. Guirguis diagnosed hyperphosphatemia, left kidney cortica medullary calcifications, and right kidney stones (R. 646-48).

Plaintiff was examined by a doctor at Webster County Memorial Hospital Clinic on July 16, 2010. It was noted Plaintiff smoked; she weighed two-hundred, seventy-four (274) pounds. Her examination was normal. She was diagnosed with hypertension, diabetes, hyperlipidemia, chronic kidney disease, and hyperphosphatemia (R. 659). She medicated with Actos, Cymbalta, Diovan, Crestor, alprazolam, albuterol inhaler, Janumet, Trilipex, allopurinol, and Lortab (R. 656).

Plaintiff reported to Dr. Guirguis on July 20, 2010, that she had back pain, poor appetite, weakness, fatigue, forgetfulness, dizziness, edema, arthritis, and weight loss. Plaintiff stated she

urinated five (5) times during the day and two (2) times during the night. Plaintiff stated she experienced thirst, dry mouth, numbness, and tingling. Plaintiff's examination was normal; specifically, her right and left kidney and bladder were within normal limits (R. 643). Plaintiff's urine was yellow and clear (R. 641). Dr. Guirguis noted Plaintiff was positive for left kidney cortica medullary calcifications and hyperphosphatemia (R. 646-50).

On September 13, 2010, Plaintiff was examined by Dr. Guirguis. Her urine was orange and cloudy. Red blood cells were present (R. 766). Plaintiff reported nausea, vomiting, poor appetite, weight loss, weakness, fatigue, forgetfulness, dizziness, fluid retention, sleep disturbance, bad taste, edema, back pain, and arthritis. Plaintiff stated she urinated six (6) times per day and once per night. She was thirsty, had dry mouth, had numbness and tingling, had cramps, and experienced change in her bowel habits (R. 768). Dr. Guirguis noted Plaintiff was positive for left kidney cortica medullary calcifications, hyperphosphatemia, hematuria, and kidney stones (R. 771-73). Dr. Guirguis ordered uric acid, renal panel, CBC, dipstick, and venipuncture testing of Plaintiff (R. 761-62). Plaintiff's vitamin D and parathyroid hormone were low (R. 763). Dr. Guirguis prescribed allopurinol (R. 764).

Dr. McElwain examined Plaintiff on September 17, 2010, relative to her right hand and both legs "going numb" and abdominal pain. Plaintiff weighed two-hundred, seventy-eight (278) pounds. Her diabetes was "well controlled." Her examination was normal. She could move her extremities "well"; she had good strength; she had normal sensation; her Tinel's and Phalen's signs were negative. Dr. McElwain diagnosed intermittent paresthesias in her hands, chronic kidney disease, fatigue, hypertension, dyslipidemia, diabetes, and obesity. Dr. McElwain ordered an EMG of her upper extremities, upper abdominal ultrasound, and a hepatobiliary iminodiacetic acid ("HIDA") scan (R. 657-58). Plaintiff medicated with Actos, Cymbalta, Diovan, Crestor, alprazolam, albuterol

inhaler, Janumet, Trilipex, Allopurino, Lortab, and potassium citrate (R. 656, 741-42).

Plaintiff's October 7, 2010, ultrasound of her right upper quadrant showed diffuse fatty infiltration of the liver (R. 736).

Dr. McElwain examined Plaintiff on October 21, 2010, for "multiple complaints," which included cough, chest congestion, sinus pressure, bilateral ear pain, and sore throat. Plaintiff reported "bright red blood" in her stools. Dr. McElwain noted Plaintiff asked her to complete "paperwork" relative to her application for disability, and she agreed to complete it. Dr. McElwain noted Plaintiff "follow[ed] up with a specialist" for renal osteodystrophy, had "not seen him for some time," and planned to "see him pretty soon." Dr. McElwain diagnosed Plaintiff with bronchitis, bilateral renal osteodystrophy, hypertension, diabetes, hyperlipidemia, chronic kidney disease, hypercholesterolemia, abdominal pain, and tobacco use. Dr. McElwain instructed Plaintiff to stop smoking. She prescribed Actos, Cymbalta, Diovan, Crestor, alprazolam, albuterol inhaler, Janumet, Trilipex, allopurinol, Lortab, and potassium citrate (R. 731, 734-35).

Plaintiff's October 21, 2010, lumbar spine x-ray showed the following: 1) mild to moderate degenerative changes; 2) transitional changes of the lumbosacral junction; and 3) "suspicion of spondylolysis at approximately L5 which may be unilateral" (R. 732).

Plaintiff's October 21, 2010, chest x-ray was normal (R. 732).

Sharon Joseph, Ph.D., a clinical psychologist, completed a psychological evaluation of Plaintiff on October 18, 2010, upon referral from Dr. McElwain (R. 702). Plaintiff reported she was involved in a car accident when she was thirty-four (34) years old. She stated she was driving her car and collided with a moving van. She stated her head "went through the windshield" and she had a "'double concussion.'" Plaintiff reported she had been diagnosed with diabetes, hyperlipidemia,

hypertension, gout, kidney disease, "nerves," pain, low iron, uric acid related to kidney problems, cyst on kidney, "calcium crystals in kidneys (stones)," asthma, and low potassium. Plaintiff medicated with Janumet, potassium citrate, Trilipex, alprazolam, Actos, hydrocodone, allopurinol, Cymbalta, Advair, Diovan, Crestor, tramadol, and ProAir. Plaintiff smoked one-half (½) package of cigarettes per day; she drank two (2) cups of caffeinated coffee per day; she rarely drank alcohol; she last used illegal drugs five (5) years earlier. Plaintiff reported she was treated for PTSD for eight (8) months after the 2004 automobile accident. Plaintiff reported her primary care physician prescribed Xanax and Cymbalta (R. 703).

Plaintiff reported she graduated high school and was never enrolled in any special education classes. Plaintiff reported past work as a gate attendant, insurance sales manager, and district manager for Combined Insurance Company (R. 703).

Dr. Joseph noted Plaintiff appeared cleanly dressed. She was oriented, time three (3). Her mood appeared depressed. Plaintiff reported little energy and varying appetites (R. 704). Plaintiff reported anxiety symptoms, she worried about money, and she felt "worthless" because she could not work. Plaintiff had no perceptual or thinking disturbances. She had no preoccupations, obsessions, or compulsions. She reported anxiety when she was "around crowds." Plaintiff had no panic attacks. Her motor activity was nervous; her posture was appropriate; her eye contact was average; her language was average; her content was relevant; and she was cooperative. She had no psychomotor disturbances. Her affective expression was anxious. Her insight was fair. Dr. Joseph noted Plaintiff "appear[ed] to have some lingering symptoms of PTSD, including concentration difficulties, increased arousal, and infrequent intrusive thoughts." Plaintiff's immediate memory and remote memory were within normal limits; her recent memory was moderately impaired. Plaintiff's

concentration was found to be moderately impaired. Her judgment was mildly impaired (R. 705).

Plaintiff scored the following on the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") assessment: Verbal Comprehension Index-76; Perceptual Reasoning Index-73; Working Memory Index-71; Processing Speed Index-68; and Full Scale IQ-67. Dr. Joseph found Plaintiff's full scale IQ score placed her in the "mild mentally impaired range" (R. 705). Dr. Joseph noted there were "some problems with internal validity in regards to the WAIS-IV secondary to what appeared to be poor concentration." Plaintiff scored the following on the Wide Range Achievement Test-4 ("WRAT-4"): Word Reading-grade 10.3; Sentence Comprehension-grade 9.2; Spelling-grade 7.3; Math Computation-grade 4.9. Dr. Joseph noted Plaintiff did "better on the WRAT-4 than she did on the WAIS-IV." She further noted that "[e]xternal validity is an issue due to the fact that she denied being in any special education classes and her work history would not be consistent with her Full Scale IQ score of 67. It is estimated that she probably functions, at least, in the Low Average Range of intellectual functioning. It is possible that some of her medications may have contributed to the decrease in her concentration." Plaintiff's outcome on the Minnesota Multiphasic Personality Inventory-2 ("MPPI-2") was that she "endorsed a number of items suggesting she is experiencing low morale and depressed mood" (R. 706).

Plaintiff reported the following activities of daily living: rose between 11:00 a.m. and noon; watched television; prepared food for dinner "a little at a time"; did housework; cooked dinner; went for "a drive with her boyfriend sometimes"; watched television; went to bed between 10:00 p.m. and 11:00 p.m. Plaintiff could make the bed, wash dishes, cook a meal, dust, put away groceries, vacuum "a little at a time," go up and down steps, iron, grocery shop, and drive a car "on a limited basis." Plaintiff stated she could remember to turn off the stove "most of the time." She reported

she could not clean the bathroom. She stated she "like[d] to spend time with her dog, read maps, watch television, and go on a drive with her boyfriend" (R. 707).

Dr. Joseph diagnosed major depression, recurrent, moderate; PTSD; pain disorder with physical and psychological components; and anxiety disorder. Plaintiff's GAF was fifty-five (55). Plaintiff's psychological prognosis was fair. Dr. Joseph recommended Plaintiff receive psychotherapy to decrease depression, adjust to her physical "problems," and "deal with any vestiges of post-traumatic stress" (R. 707). Dr. Joseph also recommended that Plaintiff be treated by a psychiatrist "for a consult in regards to antidepressant medications" (R. 708).

Dr. Joseph completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities of Plaintiff on November 2, 2010. Dr. Joseph found Plaintiff had the following limitations in understanding, remembering, and carrying out instructions: 1) mild limitations in her ability to understand, remember, and carry out short, simple instructions, exercise judgment, and make simple work-related decisions; and 2) moderate limitations in her ability to understand, remember, and carry out detailed instructions. Dr. Joseph based these findings on Plaintiff's having "moderate impairment in recent memory per MSE, mild impairment in judgement (sic) per MSE." Dr. Joseph found Plaintiff had the following limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, and normal work routines: 1) moderate limitations in her ability to maintain regular attendance and punctuality, complete a normal workday and workweek without interruptions from psychological symptoms, and perform at a consistent pace without an unreasonable number and length of work breaks; and 2) marked limitations in her ability to sustain attention and concentration for extended periods (R. 710). Dr. Joseph based these findings on Plaintiff's having "moderate impairment in concentration per MSE, pain disorder, major depression.

Sustaining attention & concentration would be markedly impaired as [Plaintiff] had great difficulty maintaining concentration during the 3 hr. testing period." Dr. Joseph found Plaintiff had the following limitations in social functioning in a normal competitive work environment: 1) mild limitations in her ability to interact appropriately with the public, maintain acceptable standards of grooming and hygiene, maintain acceptable standards of courtesy and behavior, demonstrate reliability, and ask simple questions or request assistance from coworkers or supervisors; and 2) moderate limitations in her ability to respond appropriately to direction and criticism from supervisors, work in coordination with others without being unduly distracted by them, work in coordination with others without unduly distracting them, and relate predictably in social situations in the workplace without exhibiting behavioral extremes (R. 711). Dr. Joseph based these findings on Plaintiff's "major depression and PTSD affect[ing] concentration, energy levels, self-esteem." Dr. Joseph found Plaintiff had the following limitations in adaptation in a work setting: moderate limitations in her ability to respond to changes in the work setting or work process and be aware of normal hazards and take appropriate precautions. Dr. Joseph based these findings on Plaintiff's "moderate impairment in both concentration and recent memory per MSE (re: hazards) and depressive disorder affect, ability to adjust to change in work place." Dr. Joseph found Plaintiff had the following limitations in functioning independently in a competitive work setting: 1) mild limitation in her ability to carry out an ordinary work routine without special supervision: 2) moderate limitation in her ability to set realistic goals and make plans independently of others; and 3) marked limitation in her ability to travel independently in unfamiliar places (R. 712). Dr. Joseph based these findings on Plaintiff's "major depression affect self-esteem & motivation, contributes to difficulty in realistic goal-setting. Anxiety, PTSD and concentration difficulties affect

independent travel in unfamiliar places." Dr. Joseph found Plaintiff had moderate limitations in her ability to tolerate ordinary work stress. She based this finding on Plaintiff's diagnoses of pain disorder, depression, PTSD, and anxiety (R. 713).

Dr. Joseph opined Plaintiff had been unable to work since December 8, 2008, and that the limitations and impairments Dr. Joseph had listed had "probably existed at their current level of severity since" December 8, 2008 (R. 713).

Also on November 2, 2010, Dr. Joseph completed a Psychiatric Review Technique of Plaintiff. She found Plaintiff had affective, anxiety-related, and somatoform disorders (R. 715). Plaintiff's affective disorder was depressive syndrome with sleep disturbance, decreased energy, feelings of guilt or worthlessness, or difficulty concentrating or thinking (R. 718). Plaintiff's anxiety-related disorders were anxiety disorder, NOS, and PTSD (R. 720). Dr. Joseph found Plaintiff's somatoform disorder was pain disorder with physical and psychological components (R. 721). Dr. Joseph found Plaintiff had moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. Dr. Joseph found Plaintiff had had no episodes of decompensation (R. 725).

Plaintiff's November 4, 2010, HIDA scan showed "good hepatocyte uptake and clearance in the liver" and "moderate degree of gallbladder dyskinesia with ejection fraction of 18%" (R. 729).

On November 16, 2010, Plaintiff underwent a colonoscopy for abdominal pain, nausea, vomiting, diarrhea, rectal bleeding, and a history of colon polyps. Her colon was normal (R. 757).

On December 16, 2010, Plaintiff had her gallbladder removed due to chronic acalculous cholecystitis with cholesterolosis. Dr. Hensley performed the operation (R. 754-56).

Plaintiff presented to Dr. McElwain on January 20, 2011, with complaints of left ear pain,

cough, and nasal drainage. She has no fever or shortness of breath. Plaintiff stated she had "been feeling well"; she had been "doing great." Plaintiff reported she had had her gallbladder removed and "since that time[,] she has denied any abdominal pain," vomiting or nausea. Dr. McElwain diagnosed sinusitis, renal osteodystrophy, hypertension, diabetes, hyperlipidemia, and tobacco use. Dr. McElwain instructed Plaintiff to stop smoking and refilled Plaintiff's prescriptions (R. 744).

On November 22, 2011, Dr. McElwain completed a Primary Care Physician Questionnaire of Plaintiff. She listed chronic kidney disease, hypertension, diabetes, hyperlipidemia, hyperphosphatemia, osteopenia, and fibrocystic breast as Plaintiff's medical history and diagnoses (R. 745). For each of these diagnoses, Dr. McElwain listed "labs, specialist consults, images" as the clinical findings, laboratory tests, and other data on which she based the diagnoses. Dr. McElwain listed the following "impairments and symptoms alleged by claimant": diabetes, hypertension, PTSD, rare kidney disease, high cholesterol/triglycerides, and "traumatic auto accident" (R. 746). Dr. McElwain "estimate[d]" Plaintiff could not perform heavy, medium, light, or sedentary work. Dr. McElwain found Plaintiff would need to alternate positions frequently. To support this finding, Dr. McElwain wrote "see med Hx" (R. 747). Dr. McElwain found Plaintiff could sit, stand, and walk for less than one (1) hour at a time. Dr. McElwain found Plaintiff could alternately walk or stand for less than two (2) to three (3) hours in an eight (8) hour workday. Plaintiff was not required to recline, lie down, or raise her feet during a work day (R. 748). Dr. McElwain found it was advisable or necessary for Plaintiff to have frequent rest periods during the work day as needed. Dr. McElwain "estimate[d]" that Plaintiff could occasionally climb, balance, stoop, bend, kneel, crouch, crawl, stretch, reach, and squat (R. 749). Dr. McElwain found Plaintiff's work activity was unlimited as to machinery, jarring, vibrations, excessive humidity, cold or hot temperatures, fumes, dust, noise,

and environmental hazards. Dr. McElwain found Plaintiff would experience moderate chronic pain. Plaintiff did not need to use assistive devices to ambulate (R. 750). Dr. McElwain "estimate[d]" Plaintiff could use her feet and legs, for repetitive movements, for less than two (2) hours (R. 751). Dr. McElwain found Plaintiff could not grasp, handle, use arm controls, engage in fine manipulation, and finger with either her right or left hand. Plaintiff had no loss of grip strength in either hand and she had numbness in both hands. Dr. McElwain noted Plaintiff was "being evaluated with EMG" for her hand functions. Dr. McElwain found Plaintiff was able to sit upright for prolonged periods of time at a desk or consol with her head forward in a flexed position. Plaintiff would be absent from her regular job, according to Dr. McElwain, more than twice monthly. Dr. McElwain found Plaintiff had no "'functional overlay'" of mental impairments or other impairments that would result in a greater degree of disability (R. 752). Dr. McElwain found Plaintiff would not be capable of performing a full-time job and had been unable to do so since December 31, 2008 (R. 753).

Administrative Hearing

When questioned by her lawyer at the administrative hearing, Plaintiff testified she attempted to work after her 2004 automobile accident, but she would "get out on the roads and . . . just freak" due to PTSD. She had anxiety attacks when she drove (R. 57). Plaintiff testified she "didn't meet" work-related "deadlines," so she "just packed up [her] stuff and" went to Beckley, West Virginia (R. 58). Plaintiff testified that her leg "would give out" after the accident when she attempted to climb steps; she had to "watch not falling down" due to kidney disease, which took "calcium from [her] spine and [her] hips." Plaintiff testified her height used to be five (5) feet, five and one-half (5 ½) inches. Her height was, at the time of the hearing, five (5) feet, four (4) inches (R. 59). She weighed two-hundred, eighty (280) pounds. Plaintiff had tried to lose weight, but she had to "stick to a

certain diet because of her kidneys" (R. 60). Plaintiff testified her diabetes symptoms included shakiness, nervousness, nausea, weakness, and vomiting; it was "never really . . . under control" (R. 61-63). Plaintiff testified that her kidney disease caused her body to "collect[] the salt . . . in [her] system," which caused her blood pressure to rise (R. 63). Plaintiff listed her "worst symptoms," on a daily basis, as "nausea or . . . diarrhea, headaches" (R. 64). Plaintiff's hands went numb, especially her right hand. Plaintiff testified her feet had increased in size; they hurt and swelled; her toes hurt. Plaintiff testified her shoulders hurt as if "bees [were] stinging her" (R. 65). Plaintiff stated this symptom could be due to "carpal tunnel stuff or it could be from where I've lost height and all that's working down my back." Plaintiff testified she experienced back pain, primarily where her kidneys were located. Plaintiff described her pain as eight (8) on a scale of one-to-ten (1-10) and constant (R. 66). She medicated her back pain with hydrocodone, "as needed," which could reduce her pain to "5/5" (R. 66-67). Plaintiff testified she had difficulty controlling her urination (R. 73). A "crystal or whatever" would "come out" when she urinated, which caused her to urinate occasionally on herself. She involuntarily urinated when she sneezed or coughed (R. 74). Plaintiff's energy level was "not good" due to low iron. She received iron transfusions for this condition (R. 74). Plaintiff testified PTSD caused her to be forgetful, so she had to make lists to remember things (R. 78).

Plaintiff testified she medicated with Janumet, Actos, Diovan, Cymbalta, Crestor, and Trilipix. She medicated gout with allopurinol (R. 64).

Plaintiff testified she could "mop half a floor" before she had to stop and could peel two (2) potatoes before having to stop due to numbness in her hands (R. 65, 70). After she rested her hands for ten (10) to fifteen (15) minutes, she could resume peeling potatoes. Plaintiff could prepare dinner in "short spurts" (R. 70). Plaintiff testified she could sit in a chair for less than one (1) hour.

Prolonged sitting caused her legs to go numb; the sides of her thighs were "always numb" (R. 67). Her feet would "go to sleep." Plaintiff testified she could stand for less than one (1) hour (R. 68). Plaintiff testified she could walk for less than one (1) block (R. 68-69). Plaintiff testified she could reach (R. 76). Plaintiff testified she could drive for less than one (1) hour (R. 78). Plaintiff testified she could not lift a ten (10) pound bag of potatoes; she could lift a gallon of milk using both hands (R. 69). Plaintiff testified she lay on the bed "most of the day." Plaintiff's sleep was interrupted by her hands hurting and burning. Plaintiff could not bend or squat. She had to sit or put her foot on a stool to tie her shoes (R. 72-73). Plaintiff testified she could drive to the grocery store and shop but could not carry in the groceries. She could vacuum on a day she did not shop but not all the rooms at once (R. 75-76). Plaintiff testified she could no longer work in her flower gardens (R. 76). She did not "like" to leave her home. She visited her mother every one (1) or two (2) weeks (R. 79). To do that, Plaintiff rode to Braxton County, West Virginia, from Webster County, West Virginia, and then the reverse, with her boyfriend as he traveled to and from work at a jail (R. 79).

The ALJ asked the VE the following hypothetical question:

> . . . [A]ssume a hypothetical individual of the claimant's age, educational background, and work history; would be able to perform a range of light work; should – I would require a sit/stand option; could perform postural movements occasionally, except should do minimal kneeling or crawling and no climbing of ladders, ropes, or scaffolds; should not be exposed to temperature extremes, whether humid conditions, environmental pollutants, or hazards. . . . And if you would add to that the person should work in a low-stress environment with no production line or assembly line type of pace and no independent decision-making responsibilities, would be limited to unskilled work involving only routine and repetitive instructions or tasks, and should have no interaction with coworkers and supervisors would there be anything to accommodate that scenario? (R. 81-83).

The VE responded that such a person could perform the jobs of office helper and mail clerk (R. 83).

<u>Evidence to Appeals Council</u>

Plaintiff's January 6, 2011, bone density scan of her lumbar spine and femoral neck was normal (R. 774, 823).

On February 24, 2011, Alicia Harper, a physician assistant to Dr. Topping, completed a consultative examination of Plaintiff relative to carpal tunnel syndrome. Plaintiff stated she had numbness and tingling in her fingers, bilaterally, at night. Plaintiff stated she dropped items "frequently." She had "feelings of clumsiness." She occasionally had shoulder and neck pain. Upon examination, Plaintiff had "some negative Tinel at the ulnar nerve at the elbow bilaterally." She had negative hyperflexion test at both elbows. Her Tinel sign was positive at the median nerve at the wrist. Her Phalen's sign was positive. Plaintiff's interossei strength was 5/5; her Allen test was normal; she had no thenar or hypothenar atrophy; she had no muscle wasting; she had "significant grip strength on the right." P.A. Harper noted the nerve conduction study showed Plaintiff was positive for bilateral carpal tunnel syndrome, right worse than left (R. 776-77).

Dr. McElwain treated Plaintiff on March 10, 2011, for pneumonia. Dr. McElwain prescribed prednisone and Levaquin. She instructed Plaintiff to stop smoking (R. 782).

Plaintiff's March 10, 2011, chest x-ray was normal (R. 784, 808).

On March 17, 2011, Dr. McElwain examined Plaintiff for a sinus infection (R. 785). Dr. McElwain prescribed Z-Pak (R. 786). Plaintiff's chest x-ray was normal (R. 807).

Plaintiff was evaluated by Dr. McElwain on March 28, 2011, for pneumonia. Plaintiff stated she was "doing well." Plaintiff informed Dr. McElwain that Dr. Navada "mentioned a referral to a rheumatologist for fibromyalgia." Dr. McElwain's examination of Plaintiff produced normal results, except for mild respiratory wheezes on the right. Dr. McElwain diagnosed asthma and

fibromyalgia and referred Plaintiff to a rheumatologist (R. 788).

Dr. Topping performed a right carpal tunnel release on Plaintiff on May 18, 2011 (R. 778).

On May 26, 2011, Joshua Deaton, a physician's assistant, examined Plaintiff; her examination was normal. He diagnosed "status post carpel tunnel surgery" and chronic kidney disease. He prescribed Ativan and hydrocodone (R. 790).

On June 3, 2011, P.A. Harper examined Plaintiff post right carpal tunnel release. Plaintiff reported she was "doing very well." She stated her "numbness and tingling have completely resolved." P.A. Harper removed stitches. Plaintiff had "full flexion extension of her fingers" and she could "oppose her thumb to the base of her fourth metacarpal" (R. 779).

On July 14, 2011, Plaintiff presented to Linda Little, a physician assistant to Dr. Topping, for examination relative to her May 18, 2011, right carpal tunnel release. She reported that, four (4) days after she had had her stitches removed, she fell and "land[ed] on her outstretched right hand." She experienced increased pain and bruising in the palmar surface of her right hand. Plaintiff complained of shoulder and knee pain. Plaintiff reported that, "for the most part[,] her hand [was] doing much better." P.A. Little found her "symptoms have resolved as far as forearm pain and numbness." Upon examination, P.A. Little found Plaintiff had "good flexion extension of her [right] wrist." She could make a complete fist. Her radial pulses were 2+. P.A. Little found her neurovascular examination was normal. P.A. Little instructed Plaintiff to do home exercises for her shoulder (R. 780).

Dr. Kafka, a rheumatologist, conducted a consultative examination of Plaintiff on July 18, 2011, for polymyalgias and polyerthralgias. Plaintiff reported she had pain in her upper back, arms, hands, knees, and feet, which began in 2004 and had worsened over time. Plaintiff stated she had

knots in her arm and thigh muscles and burning in her joints behind her knees and elbow. Her knees swelled and became hot, more so on the right than left side. Plaintiff informed Dr. Kafka that she had "stinging between her shoulder blades." Plaintiff stated "[h]er body just hurt[] to be touched." Plaintiff reported she did not sleep well unless she medicated with Tylenol PM. Plaintiff informed Dr. Kafka that she had "undergone a carpal tunnel surgery" and Dr. Navada "felt she might have some fibromyalgia." Plaintiff stated she was being treated for gout. She medicated with Cymbalta and Neurontin. Plaintiff said she did not "notice much improvement with the Neurontin yet." Plaintiff did not have weakness, dry eyes, rash, sun sensitivity, Raynaud's phenomenon, history of iritis, psoriasis, or inflammatory colitis. Plaintiff reported her past history was for headaches, renal osteodystrophy, gout, diabetes, pneumonia, asthma, and hypertension. Plaintiff reported she had had multiple sebaceous cysts removed; left knee and hand surgeries after an accident; cholecysectomy; and right carpal tunnel release (R. 832). Plaintiff medicated with Actos, Janumet, potassium, Crestor, Cymbalta, Diovan, allopurinol, Trilipix, Xanax, hydrocodone, Advair, ProAir, Neurontin, and vitamin D. Plaintiff reported her mother, grandmother, and aunt were positive for rheumatoid arthritis, gout, and fibromyalgia. Plaintiff smoked one-half (½) package of cigarettes per day. Plaintiff stated she was positive for weight gain (20) pounds; fatigue; dry mouth; hypertension; swollen legs or feet; wheezing; urination difficulty, pain, burning; hematuria; cloudy urine; nocturia; easy bruising; nodules; bumps; morning stiffness lasting three (3) or four (4) hours; joint pain; muscle tenderness; joint swelling; hand sensitivity; feet sensitivity; night sweats; anxiety; easily losing temper; depression; difficulty falling asleep; excessive thirst; and frequent sneezing. Plaintiff reported she was negative for lupus; weight loss; weakness; fever; eye pain, redness, dryness, and itching; blurred or double vision; tinnitus; hearing loss; nosebleeds; loss of smell; nose dryness;

runny nose; sore tongue; bleeding gums; mouth sores; loss of taste; frequent sore throats; hoarseness; difficulty swallowing; chest pain; irregular heartbeat; heart murmur; shortness of breath; orthopnea; cough; coughing blood; nausea; vomiting blood or "coffee ground material"; stomach pain; jaundice; constipation; diarrhea; blood in stools; black stools; heartburn; "'smoky urine'"; pus in urine; skin redness, rash, hives, sun sensitivity, or tightness; hair loss; color changes in hands or feet; headaches; dizziness; fainting; muscle spasms; loss of consciousness; memory loss; excessive worries or agitation; swollen glands; tender glands; anemia; bleeding tendency; and increased susceptibility to infection (R. 833-34).

Plaintiff was five (5) feet, four (4) inches; she weighed two-hundred, ninety-seven (297) pounds. Her pain scale was reported as seven (7) out of ten (10). Upon examination, Dr. Kafka found Plaintiff's HEENT, neck, lungs, heart, abdomen, extremities, and skin were normal. Dr. Kafka found there was "good strength in all extremities, reflexes are normal throughout." Plaintiff had no neurological deficits. Dr. Kafka found tenderness of the cervical and lumbar spine, but good range of motion; shoulder tenderness, bilaterally, with no swelling and good range of motion; very mild tenderness in hips, bilaterally; crepitus and tenderness in both knees, but no swelling; mild tenderness in both ankles, but no swelling; and tenderness of "MTP" joints and mild swelling. Dr. Kafka found Plaintiff's thoracic spine, sacroiliac joints, temporomandibular joints, elbows, wrists, "SC," "MCPs," "PIPs," and "DIPs" were all within normal limits and had good ranges of motion. Dr. Kafka's examination "reveal[ed] 17 or 18 positive fibromyalgia tender points" and found Plaintiff met the diagnostic criteria for fibromyalgia. Dr. Kafka noted Plaintiff was medicating with Cymbalta, Neurontin, and allopurinol (R. 834-35). Dr. Kafka ordered blood work and x-rays of Plaintiff's knees and lumbosacral spine (R. 836).

Plaintiff's July 26, 2011, lumbar spine x-ray showed mild subluxations, which were "likely degenerative" (R. 837). Her left knee x-ray showed no acute pathology (R. 838). Plaintiff's right knee x-ray showed mild degenerative findings; specifically, there was "[s]mall suprapatellar joint effusion . . . suggested" (R. 839).

On July 29, 2011, P.A. Deaton examined Plaintiff; her examination was normal. Plaintiff reported that her carpal tunnel release pain was subsiding and that "Dr. Topping . . . stated she may have some possible fibromyalgia from the EMG test and . . . she [would] be treated for fibromyalgia by her rheumatologist for right now." P.A. Deaton diagnosed carpal tunnel status post surgery, chronic kidney disease, asthma, fibromyalgia, hypertension, diabetes, hyperlipidemia, and tobacco use and refilled Plaintiff's prescriptions for Actos, Cymbalta, Diovan, Crestor, alprazolam, albuterol inhalers, Janumet, Trilipix, allopurinol, hydrocodone, and Advair (R. 792).

On July 30, 2011, Plaintiff was treated at the Webster County Memorial Hospital emergency department for an insect "sting or bit (sic)" that she incurred while swimming. She was prescribed prednisone, Benadryl, and Keflex (R. 814-17).

On August 3, 2011, Plaintiff informed P.A. Deaton that she had been treated at Webster County Memorial Hospital emergency department one week earlier for an insect bite that she received under her bathing suit while "in the river." Plaintiff stated she had wheezing in her left lung. Upon examination, P.A. Deaton found Plaintiff was alert, cooperative, and well oriented. Her left lung was positive for wheezing. P.A. Deaton diagnosed "some type of insect bite," allergies, and asthma. P.A. Deaton prescribed Singulair and a nebulizer. P.A. Deaton provided albuterol and Atrovent nebulizer treatment samples to Plaintiff because she "had trouble getting insurance to pay for them" (R. 794-95). Plaintiff's chest x-ray was normal (R. 806).

Plaintiff's August 15, 2011, CCP antibiodies were normal (R. 842-43).

Plaintiff returned to P.A. Deaton on August 25, 2011, for follow up treatment for her emergency room visit for bronchitis and stubbing her toe. Plaintiff reported Singulair "help[ed]" her allergies. She reported her left great toenail had to be removed after she kicked a rock in the river. P.A. Deaton's examination of Plaintiff produced normal results. He diagnosed allergies, asthma, left great toe injury, chronic kidney disease, carpal tunnel syndrome, fibromyalgia, hypertension, diabetes, hyperlipidemia, and tobacco use; he prescribed Lortab and Xanax (R. 797-98).

An office note was made on August 30, 2011, by a staff person in Dr. Kafka's office, which read that an appointment would be made with Plaintiff to "discuss" treatment options. All tests were negative (R. 844).

P.A. Deaton completed a "DHHR" physical of Plaintiff on September 8, 2011 (R. 800).

Dr. Kafka examined Plaintiff on September 21, 2011. Plaintiff's HEENT, cardiovascular, respiratory, neurological, neck, lungs, abdomen, extremities, and skin examinations were normal (R. 845). She had thoracic spine, lumbar spine, "MCP," and "PIP" tenderness. Plaintiff was diagnosed with fibromyalgia, gout, osteoarthritis, and plantar fasciitis (R. 846). Dr. Kafka prescribed Flexeril and Voltaren gel (R. 847).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Alexander made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since December 8, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

33

3.      The claimant has the following severe impairments: mild to moderate degenerative changes of the lumbar spine; history of cervical strain; history of fracture of the left metacarpal; history of left knee surgery; bilateral degenerative arthritis of the knees; obesity; history of recurrent asthmatic bronchitis; kidney cyst; major depressive disorder; anxiety disorder; diagnosis of pain disorder; and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c) and 416.920(c)) (R. 31).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 32).

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the type of work must: allow the option to sit or stand without breaking tasks; require no climbing of ropes/ladders/scaffolds, kneeling, or crawling and only occasional performance of other postural movements (i.e., climbing ramps/stairs, balancing, and stooping); entail no exposure to temperature extremes, wet or humid conditions, environmental pollutants, or hazards (e.g., dangerous moving machinery, (sic) or unprotected heights); be in a low stress environment with no production/assembly line type of pace and no independent decision making responsibilities; be unskilled work activity, consisting of only routine and repetitive instructions and tasks; and require no interaction with the general public and no more than occasional interaction with co-workers and supervisors (R. 33-34).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on December 8, 1971[,] and was 37 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (R. 39).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 8, 2008[,] through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 40).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1.     There is lack of substantial evidence to support the Commissioner's decision when no limitation of the hands or wrists were included in the ALJ's REC, the ALJ erroneously found that carpal tunnel syndrome was not a severe impairment, and the Appeals Council failed to remand the case for new and material evidence of treatment and surgery for carpal tunnel syndrome shortly after the ALJ decision. (Plaintiff's Brief at 3.)

2.     The ALJ also failed to include chronic kidney disease/kidney calcinosis as a severe impairment. (Plaintiff's Brief at 8.)

3.     The ALJ utilized an incorrect step one credibility standard; the step two credibility analysis was insufficient and included errors of fact and omissions of evidence favorable to the Plaintiff. (Plaintiff's Brief at 10.)

4.     The ALJ gave insufficient reasons for rejecting the functional assessments of treating physician McElwain and examining psychologist Joseph. (Plaintiff's Brief at 12.)

5.     The Appeals Council also erred in failing to remand the case for new and material evidence of fibromyalgia diagnosed by a rheumatologist. (Plaintiff's Brief at 15.)

The Commissioner contends:

1.     The ALJ reasonably determined that Plaintiff's subjective complaints were not fully credible. (Defendant's Brief at 8.)

2.     The ALJ complied with the regulations when he evaluated the opinion evidence. (Defendant's Brief at 11.)

3.     The ALJ properly evaluated Plaintiff's kidney impairment. (Defendant's Brief at 13.)

4.     The ALJ properly evaluated Plaintiff's carpal tunnel syndrome. (Defendant's Brief at 13.)

5.     The additional evidence submitted by Plaintiff regarding carpal tunnel syndrome and fibromyalgia do not warrant remand. (Defendant's Brief at 14.)

## C. Carpal Tunnel Syndrome

Plaintiff first argues: "There is lack of substantial evidence to support the Commissioner's decision when no limitation of the hands or wrists were included in the ALJ's REC, the ALJ

erroneously found that carpal tunnel syndrome was not a severe impairment, and the Appeals Council failed to remand the case for new and material evidence of treatment and surgery for carpal tunnel syndrome shortly after the ALJ decision." (Plaintiff's Brief at 3.) Defendant asserts that the ALJ properly evaluated Plaintiff's carpal tunnel syndrome. (Defendant's Brief at 13-14.) The undersigned will address only the ALJ's decision at this point in the opinion and will address the Appeals Council decision later.

Regarding Plaintiff's hand and wrist complaints, the ALJ wrote:

> The record contains a diagnosis of bilateral carpal tunnel syndrome; however, there is not electromyography ("EMG") to confirm the presence of this condition. Further, as discussed, below, while the claimant has complained of numbness in her hands and arms, the physical findings are inconsistent with carpal tunnel syndrome. Indeed, she had negative Tinel and Phalen signs, and she has 5/5 strength in her upper extremities. Exhibits 17F and 32F. To give the claimant the utmost benefit of the doubt, the undersigned finds that this is a medically determinable impairment, but that it is nonsevere with no associated functional limitations.

(R. at 32).

At step two of the sequential evaluation, Plaintiff bore the burden of producing proof that she had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). However, a mere diagnosis of a condition is insufficient to prove disability. There must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). "The severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007). An impairment is not severe "only if it is a *slight abnormality* which has such a *minimal* effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal citation and quotation omitted) (emphasis in original); see also 20 C.F.R. §§ 404.1521(a)("An impairment . . . is not severe if it does not significantly limit your physical or

mental ability to do basic work activities.").

As an initial matter, Plaintiff is correct that there actually was an EMG performed in 2005, relative to her auto accident in 2004. The doctor who read the EMG indicated that it showed she had compression of her carpal volar ligaments and positive Tinel's and Phalen's signs. (R. at 368.) He "felt" that carpal tunnel release with decompression of the nerve was indicated and scheduled her for the surgery in September of that year. Workers' Compensation apparently denied payment for the procedure, so it did not take place. The EMG itself did indicate bilateral carpal tunnel syndrome, worse on the left.

In 2004, at the time of the accident, Dr. Grady noted Plaintiff had carpal tunnel syndrome, which resulted in "some sensory abnormality of the right hand" and "some residual posttraumatic tendinitis and impairment of the thumb," also on the right hand. In October 2005, Dr. Grady found "slightly decreased range of motion of the right hand" and no "residual problems" from her left long finger fracture (R. at 461).

In 2009, Plaintiff told Dr. Sabio only that her right hand got numb "on and off." Dr. Sabio examined Plaintiff and found she had full strength in the upper extremities and normal fine manipulation. (R. at 549.) Her handgrips were measured at 18 Kg on the right and 6 Kg on the left. He did not diagnose carpal tunnel syndrome or any hand, wrist, or arm disorder.

On May 28, 2009, Dr. Morgan completed a Physical Residual Functional Capacity Assessment of Plaintiff. She noted that Plaintiff could occasionally lift and carry 50 pounds; could frequently lift and carry 25 pounds; and had no manipulative limitations. (R. at 552-59.) Three months later, Dr. Franyutti completed another Physical Residual Functional Capacity Assessment of Plaintiff. He noted that Plaintiff could occasionally lift and carry 20 pounds; could frequently lift

and carry 10 pounds; and had no manipulative limitations. (R. at 571-74.)

On September 17, 2010, Dr. Luke McElwain examined Plaintiff for her complaint of her right hand "going numb." (R. at 657-58.) Dr. McElwain noted that Plaintiff could move her extremities "well" and that she had good strength, normal sensation, and negative Tinel's and Phalen's signs. (Id.) He diagnosed intermittent paresthesias[1] in her hands. (Id.)

The undersigned finds that substantial evidence supports the ALJ's decision to not include carpal tunnel syndrome as a severe impairment. As noted above, although the EMG in 2005 showed bilateral carpal tunnel syndrome, more recent evidence contained in the record indicates that Plaintiff had no manipulative limitations and had good strength in her hands. (See R. at 549, 571-74, 657-58.) Accordingly, the undersigned finds that Plaintiff's argument is without merit, as she has failed to meet her burden of demonstrating that her alleged carpal tunnel syndrome caused functional loss. See Gross, 785 F.2d at 1165; Grant, 699 F.2d at 191.

### D. Kidney Disease/Calcinosis

Plaintiff next alleges the ALJ failed to include chronic kidney disease or kidney calcinosis as a severe impairment. (Plaintiff's Brief at 9-10.) Specifically, Plaintiff asserts that the ALJ should have included the need for additional bathroom breaks in her RFC. Defendant contends that Plaintiff's argument is without merit because the ALJ sufficiently considered Plaintiff's kidney impairment. (Defendant's Brief at 13.)

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1);

---

[1] An abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus. Dorland's Illustrated Medical Dictionary ("Dorland's"), p. 1383 (32d ed. 2011).

416.945(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

As an initial matter, the ALJ did include Plaintiff's kidney cyst as a severe impairment. (R. at 31.) Regarding Plaintiff's kidney condition, the ALJ wrote:

> In August 2009, the claimant underwent a renal ultrasound, which showed no renal obstruction. However, there was a complicated cyst in the right kidney as well as non-obstructing stones in the left kidney. . . . These findings were somewhat confirmed by a CT scan of the abdomen and pelvis. . . . In September 2009, the claimant followed up for her kidney condition with the Rural Health Clinic, seeking Lortab for pain allegedly associated with the kidney stones. The claimant was refused this medication. . . . In October 2009, the claimant presented to Dr. N. Guirguis, M.D., at the Kidney Center for an evaluation of her kidney condition. He opined that the claimant's condition mirrored the presentation of tumoral calcinosis, and he recommended a complete work-up.

(R. at 35-36.)

The evidence in the record establishes that Dr. Guirguis treated Plaintiff's kidney condition

from 2009 until 2010. On October 22, 2009, he found that Plaintiff could experience "pain similar to kidney stones in absence of actual stones" because of her kidney condition. (R. at 598.) He continued to treat Plaintiff's kidney condition with medication and lab work. (R. at 613-14, 618-19, 761-62, 764.) During several appointments, Dr. Guirguis noted that Plaintiff's kidneys were normal. (R. at 615, 622, 643, 652.) At no time did he note that the number of times Plaintiff used the bathroom per day was excessive. Given Plaintiff's failure to include any evidence indicating that she would require additional bathroom breaks, the undersigned finds that substantial evidence supports the ALJ's evaluation of Plaintiff's kidney condition and his assessment of her RFC. See Hunter, 993 F.2d at 35.

### E. Credibility Analysis

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

In Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. The first step states as follows:

> [F]or pain to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind of severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a

medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant."

Id. at 594 (citation omitted).

Plaintiff first asserts that the ALJ erred because his Step One finding "was vague and imprecise as to which symptoms were NOT reasonably expected from medical/mental impairments." (Plaintiff's Brief at 10.) Here, the ALJ noted, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . ." (R. at 35.) Although not the precise language used in Craig, the undersigned finds the ALJ did find that Plaintiff met the first step of the evaluation. He was therefore required to proceed to the second step and evaluate the intensity and persistence of her pain and the extent to which if affected her ability to work.

Plaintiff next argues that the ALJ's Step Two finding is "based on factual errors and significant omissions." (Plaintiff's Brief at 12.) Specifically, Plaintiff lists the following eight pieces of information omitted from the ALJ's credibility determination:

- The record supports a more convincing source of back pain than the X-ray of minor degenerative changes of the lumbar spine and the X-ray showing mild to moderate degenerative changes with suspected spondylolysis at L5, consisting of the statement and records of Dr. Guirguis confirming Amy's kidney disease as a source of pain. T. 35-36.

- The only gaps in claimant's treatment after the alleged onset date were caused by lack of medical insurance and "scarce resources." Claimant was not awarded Medicaid until April 30, 2009. T. 522-523. She underwent two consultative examinations for DDS in May [T. 524, 546] and began treatment at Rural Health Clinic in Webster Springs in June of 2009. T. 564. After Dr. Guirguis's evaluation and diagnoses, narcotics were prescribed by Dr. Guirguis and later by the clinic physicians. R. 656, 731, T. 35.

- The diagnoses of diabetes mellitus, hypertension, dyslipidemia, anxiety, chronic back pain, right upper extremity neuropathy, and bronchitis made by the Rural Health Clinic are all supported by objective evidence. T. 35.

- In addition to the X-ray of the left knee, Dr. Sabio had recorded objective clinical evidence of crepitance, tenderness, and limitation of motion of the knees.  T. 546-550.

- Claimant had regular treatment throughout the time covered by the claim.  Amy saw Dr. Guirguis on 10/8/09, 10/22/09, 12/15/09, 1/5/10, 4/20/10, 9/13/10, 1/25/11.  T. 599-611, 612-637, 638-652, 759-760, 761-773.  She had office visits at the Rural Health Clinic on 6/30/09, 7/28/09, 8/20/09, 8/27/09, 9/30/09, 3/24/10, 4/16/10, 7/16/10, 9/17/10, 10/12/10, had colonoscopy and gall bladder surgery in November and December 2010 [T. 754-758, visited the clinic on 1/20/11.  T. 560-569, 584-595, 653-671, 730-743, 744, 745-753.

- Mental health treatment was provided by primary care physicians at Rural Health Clinic who prescribed Xanax, Cymbalta, and Amitriptyline.  Supra.

- Amy was doing well in January, 2011 when she saw Dr. McElwain, as she had just recuperated from recent gallbladder surgery with complete relief of gastrointestinal symptoms.

- Claimant was advised to lose weight and stop smoking.  Amy has been morbidly obese since at least 1999 when she weighed 285 pounds.  T. 320.  In 2002 appetite suppressants had not been effective.  T. 701.  Amy testified that her kidney diet conflicted with her diabetic diet, which made it difficult for her to manage her diet and to lose weight.  T. 60.

(Id. at 11-12.)

The Fourth Circuit has mandated the following procedure relative to the consideration and analysis of an individual's complaints of pain:

It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . .  Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, . . .; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). . . .; and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. . . .

Craig, 76 F.3d at 594.

Additionally, 20 C.F.R. § 404.1529(c)(3) states as follows:

(c) *Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work—*

> (3) *Consideration of other evidence.* Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

> (I) Your daily activities;

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;

> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms (SSR 96–7p).

A review of the record shows that the ALJ complied with both <u>Craig</u> and 20 C.F.R. § 404.1529(c)(3). Specifically, the ALJ considered and evaluated the objective medical evidence of record and Plaintiff's activities of daily living; her statements about the location, duration, frequency, and intensity of her pain; the precipitating and aggravating factors that caused her pain; the treatment she underwent to mitigate pain; and other factors relative to Plaintiff's condition.

As noted above, Plaintiff first takes issue with the ALJ's review and evaluation of the objective medical evidence by noting information that was omitted form his discussion. Specifically, she argues that the ALJ failed to discuss Dr. Guirguis's records confirming her kidney disease as a source of pain; Dr. Sabio's examination of her left knee, and the objective evidence regarding her diagnoses for diabetes mellitus, hypertension, dyslipidemia, anxiety, chronic back pain, right upper extremity neuropathy, and bronchitis made by physicians at the Rural Health Clinic. With regards to these conditions, the ALJ noted:

> [T]he claimant underwent an x-ray of her lumbar spine which showed only *minor* degenerative changes of the lumbar spine. . . . Obviously, this is inconsistent with the claimant's allegations of severe back pain of an eight of ten in terms of severity.

> The consultative examination occurred during what appears to be another significant gap in the claimant's treatment. Indeed, after her March 2009 visit at the Rural Health Clinic, the claimant did not have another visit until June 2009 when she presented again at the Rural Health Clinic, seeking to establish a physician. At that time, the claimant complained that she "just hasn't felt well for the past few weeks," again, suggesting that the claimant did not experience significant symptoms prior to that time. During that visit, the claimant was diagnosed with diabetes mellitus, hypertension, dyslipidemia, anxiety, chronic back pain, right upper extremity neuropathy, and bronchitis. It is noted, however, that these diagnoses were based nearly entirely on the claimant's subjective complaints, and it is also noted that the claimant's treating physician declined to prescribe the claimant any narcotic medications for pain. . . .

In July 2009, the claimant underwent an x-ray of the left knee, which showed only mild osteoarthritis.

(R. at 35.)

Contrary to Plaintiff's assertion, Dr. Guirguis's records did not confirm her kidney disease as a source of back pain. On October 22, 2009, Dr. Guirguis noted that Plaintiff's complaints of back pain, tender bones, and lost height suggested "underline osteopenia." (R. at 597.) The undersigned finds that this statement was merely a supposition by Dr. Guirguis and not a definitive statement that her kidney disease was a source of severe back pain. Additionally, no other medical evidence confirmed Plaintiff's kidney disease as a source of back pain.

The undersigned also finds that the ALJ correctly noted that Plaintiff's diagnoses of diabetes mellitus, hypertension, dyslipidemia, anxiety, chronic back pain, right upper extremity neuropathy, and bronchitis were based almost entirely on Plaintiff's subjective complaints. Plaintiff visited the Rural Health Clinic on June 30, 2009 to establish a physician. (R. at 563-64.) The treatment notes state, "Looking over at her medicines, it appears that she does have DM, HTN, dyslipidemia, anxiety, issues with chronic back pain. . . . She has been having some issues with SOB as well as a cough and audible wheeze. She states she just hasn't felt well for the past few weeks." (R. at 564.) No clinical studies supported these diagnoses.

With regards to Plaintiff's complaints of knee pain, the undersigned agrees with Plaintiff that Dr. Sabio's consultative examination revealed "tenderness of both knees with crepitus on movement." (R. at 548.) He also noted that she could not extend her knees bilaterally "due to pain and stiffness in both knees." (R. at 549.) However, the ALJ then discussed how in March 2010, Dr. Vonda McElwain noted that Plaintiff did not have any complaints of pain in her legs. (R. at 36.) Furthermore, in January 2011, Plaintiff reported that she was "doing great" when she presented to

Dr. McElwain for a check-up. (R. at 744.) While Plaintiff states that this comment was made only with regards to her recent gallbladder surgery, the fact remains that she did not complain of any knee pain to Dr. McElwain, and Dr. McElwain did not note any crepitus, tenderness, or limitation of movement upon examining Plaintiff.

Plaintiff also argues that the ALJ failed to note that she received mental health treatment through her primary care physicians at the Rural Health Clinic. With regards to Plaintiff's mental complaints, the ALJ noted that she did "not have a longitudinal history of mental health treatment since the alleged onset date of disability, which is a factor that detracts from the credibility of her allegations concerning the severity of her symptoms." (R. at 36.) He also noted that "in spite of her mental complaints, the claimant has not attended mental health treatment since the alleged onset of disability." (R. at 37.)

The undersigned agrees with Plaintiff that her primary care physicians at the Rural Health Clinic did diagnose her with depression and prescribed Xanax. (R. at 585-85.) On August 27, 2009, Plaintiff reported that her anxiety was "well controlled" with Xanax. (R. at 586.) However, the undersigned notes that Plaintiff's lack of treatment by specialized mental health providers was noted by Dr. Joseph on October 18, 2010, when she recommended that Plaintiff receive psychotherapy to decrease her depression and that she be treated by a psychiatrist "for a consult in regards to antidepressant medications." (R. at 708.)

Plaintiff also takes issue with the ALJ's determination that her "apparent ambivalence and lack of motivation to follow through with medically advised treatment" undermined her credibility. (R. at 37.) Specifically, the ALJ stated:

> Unfortunately, many of the claimant's severe impairments are likely the result of her failure to properly take care of herself. She was urged by her physicians to lose

weight and quit smoking, but she declined to do so. The claimant's failure to heed her physician's warnings is not indicative of a good faith desire to improve her health so as to facilitate a return to the workforce and contraindicates any intractable disability.

(Id.) As noted above, Plaintiff argues that the ALJ omitted discussion of her testimony that her kidney diet conflicted with her diabetic diet, making it difficult for her to lose weight.

The record indicates that on May 13 and June 30, 2009, Plaintiff weighed 276 pounds. (R. at 548, 563.) On March 24, 2010, she weighed 292 pounds. (R. at 663-64.) On July 16, 2010, she weighed 274 pounds (R. at 659), and she weighed 278 pounds on September 17, 2010 (R. at 657-58). At the time of her hearing, she weighed 280 pounds. (R. at 60.)

No objective evidence in the record supports Plaintiff's testimony that her kidney diet conflicted with her diabetic diet, making it difficult for her to lose weight. Instead, the record demonstrates that Plaintiff's weight remained relatively the same during the period from the alleged onset date until the ALJ's decision. Accordingly, the ALJ was permitted to consider Plaintiff's efforts of weight loss in his credibility discussion. See 20 C.F.R. §§ 404.1529(c)(1)-(4), 416.929(c)(1)-(4).

With regards to Plaintiff's continued smoking, the Fourth Circuit has stated that the Commissioner can only "deny the claimant benefits because of alcohol or tobacco use if she finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop." Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984). The record shows that Plaintiff has been advised several times to stop smoking. (R. at 585, 663-64, 731, 734-35, 744.) However, the ALJ did not make a finding that Plaintiff could voluntarily stop smoking. Accordingly, the undersigned finds that the ALJ erred by relying on Plaintiff's continued smoking to find her partially credible. Again, however, the undersigned believes this error does not deprive

the ALJ's credibility determination of substantial evidence because, as noted above, objective medical evidence contradict Plaintiff's statements about her pain and symptoms. See Morgan v. Barnhart, 142 F. App'x 716, 723 (4th Cir. 2005) (quoting Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004)).

For these reasons, the undersigned finds that substantial evidence supports the ALJ's credibility determination.

### F. Opinions of McElwain and Joseph

Plaintiff next asserts that the ALJ erred by assigning little weight to the functional assessments completed by treating physician Dr. Vonda McElwain and examining psychologist Dr. Joseph. (Plaintiff's Brief at 12-14.) Defendant contends that the ALJ properly assigned little weight to their opinions. (Defendant's Brief at 11-13.)

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig, 76 F. 3d at 589. The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig, however, the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

Dr. McElwain

Plaintiff specifically alleges that Dr. McElwain's opinion should have been assigned controlling weight because she was the only examining medical practitioner to provide a functional assessment during the period in issue and because her opinion is consistent with Plaintiff's statements and testimony and with the record. (Plaintiff's Brief at 13-14.) The undersigned disagrees. The ALJ discussed the January 2011 functional assessment prepared by Dr. McElwain and stated that he was only able to accord it "little weight,"noting

> Dr. McElwain served as the claimant's treating physician since March 2010, but she examined the claimant infrequently. It does not appear that she conducted any extensive testing to gauge the severity of the claimant's complaints. Indeed, Dr. McElwain noted on multiple occasions that she wanted the claimant to undergo electromyography ("EMG"), but there is no evidence that this ever occurred. . . . Further, her report is so contradictory as to suggest that she placed very little thought into her evaluation. In fact, Dr. McElwain inexplicably opined that the claimant was capable of light exertional work, but that she was incapable of sedentary exertional work. Dr. McElwain indicated the claimant had difficulty with numbness in the upper extremities, but she admitted that the claimant had not been evaluated with an EMG. Dr. McElwain opined that the claimant was capable of performing full-time work as of December 31, 2008 (a date near the time of the claimant's alleged onset date of disability), but she declined to offer an opinion as to when the claimant became incapable of full-time work. Overall, Dr. McElwain's opinion does not reflect a thoughtful review of the record and is of little value to the trier of fact.

(R. at 38.)

While Defendant does not dispute that Dr. McElwain is a "treating physician," the stated

reason a treating physician's opinion should be afforded great weight is because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell, 699 F.2d at 187.. Here, Dr. McElwain actually saw Plaintiff only three times from March 2010 until January 2011. Prior to completing the form questionnaire in January 2011, her last encounters with Plaintiff were in March 2010, October 2010, and January 2011. The form does not indicate any further examination of Plaintiff by Dr. McElwain. Accordingly, the undersigned does not find that this was a "continuing observation" of Plaintiff's conditions "over a prolonged period of time." Id.

In any event, the undersigned agrees with the ALJ's assignment of "little weight" to Dr. McElwain's functional assessment. On January 22, 2011, Dr. McElwain completed the "Primary Care Physician Questionnaire" for Plaintiff. This questionnaire was in a "check off" form, which has been referred to by other courts as "weak evidence at best." See, e.g., Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Mason has been cited with approval by a number of district courts within the Fourth Circuit. See, e.g., Wright v. Astrue, 2013 WL 275993, at *5 (W.D. Va. Jan. 24, 2013); McGlothlen v. Astrue, 2012 WL 3647411, at *6 (Aug. 23, E.D.N.C. 2012); Bishop v. Astrue, 2012 WL 951775, at *3 n.5 (D.S.C. Mar. 20, 2012). In this case, even though Dr. McElwain was asked to identify the clinical findings and laboratory tests upon which she based her diagnoses, she only listed "labs, specialist consults, imaging." Furthermore, as noted above, she herself had only seen Plaintiff three times in a ten-month period.

In this form, Dr. McElwain opined that Plaintiff could not perform heavy, medium, or sedentary work, but could perform light work. She also noted that Plaintiff must alternate positions

frequently and could only sit, stand, and walk for approximately one hour at a time. Dr. McElwain advised that Plaintiff would only be able to be on her feet two to three hours of an eight-hour period, would only be able to sit upright two to three hours in an eight-hour period, should recline throughout the day with her feet up, and would need frequent rest periods as needed. She opined that Plaintiff could occasionally climb, balance, stoop and bend, kneel, crouch, crawl, stretch, reach, and squat. Her opinion was that Plaintiff would be expected to experience both chronic moderate pain and severe intermittent pain from her impairments. Dr. McElwain went on to note that Plaintiff could never use her right and left hands for grasping, handling, fingering, or doing fine manipulations. Finally, she stated that Plaintiff would not be capable of performing a full-time job and had been unable to do so since December 31, 2008. (R. at 753.)

The undersigned finds that Dr. McElwain's form opinion is inconsistent with her own notes from office visits. Specifically, on January 20, 2011, two days before she completed the form questionnaire, Dr. McElwain noted that Plaintiff reported that she was "doing great." (R. at 744.) At no time did Dr. McElwain note any complaints from Plaintiff regarding pain when sitting, standing, walking, or using her right and left hands.

Dr. McElwain's opinion is also inconsistent with those given by the state agency reviewing physicians. 20 C.F.R. § 1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence except for the ultimate determination about whether you are disabled.

Specifically, Dr. Morgan found that Plaintiff could both sit and stand for six hours during an eight-hour workday. She also found that Plaintiff had no manipulative limitations and that her allegations were not fully credible. Dr. Franyutti agreed with these assessments.

Finally, Dr. McElwain's opinion is inconsistent with the other medical evidence contained in the record. On May 13, 2009, Dr. Sabio completed a consultative examination of Plaintiff. Specifically, Dr. Sabio determined that Plaintiff's fine manipulation movements were normal and that her motor strength was 5/5 in her upper and lower extremities, bilaterally. (R. at 548.) Furthermore, Plaintiff saw Dr. Luke McElwain, another practitioner at Webster County Memorial Hospital Clinic, on September 17, 2010, with complaints of her right hand and both legs "going numb." Despite these complaints, Dr. McElwain's examination of Plaintiff was "normal." Specifically, he noted that Plaintiff could move her extremities "well," had good strength and normal sensation, and that her Tinel's and Phalen's signs were negative. He diagnosed intermittent paresthesias in her hands.

In sum, Dr. Vonda McElwain's functional assessment is contradicted by other persuasive evidence and is inconsistent with her own treatment notes. Therefore, the undersigned finds that substantial evidence supports the ALJ's assignment of little weight to this opinion, even if Dr. McElwain is deemed to be a treating physician.

Dr. Joseph

Plaintiff also asserts that Dr. Joseph's mental residual functional capacity assessment "should have been entitled to the greatest weight." (Plaintiff's Brief at 14.) Again, the undersigned disagrees. The ALJ assigned "little weight" to Dr. Joseph's opinion, noting:

> Her assessment that the claimant has marked difficulty maintaining concentration, persistence, or pace is not consistent with the evidence as a whole. Considering

53

the claimant's reported activities of daily living and the results of the prior consultative examination, the undersigned finds it highly unlikely that the deficiencies in concentration observed by Dr. Joseph are representative of her true baseline status. Rather, Dr. Joseph's examination is a mere snapshot of the claimant's overall picture as she only visited with the claimant on one occasion. Further, Dr. Joseph's opinion is somewhat contradictory as she assessed the claimant a GAF of 55, which is indicative of only moderate symptoms. This is inconsistent with her opinion that the claimant had marked difficulty with concentration, persistence, or pace. Such an assessment is also inconsistent with the claimant's reported activities of daily living, which include reading, driving, and cooking, all of which require some degree of concentration. In order to give the claimant the utmost benefit of the doubt, the undersigned has incorporated those limitations assessed by Dr. Joseph (which are consistent with the evidence as a whole) in the above residual functional capacity.

(R at 38.)

In her psychological assessment of Plaintiff, Dr. Joseph indicated that Plaintiff appeared to have lingering symptoms of PTSD, including some concentration difficulties. She determined that Plaintiff's concentration was moderately impaired "as reflected by performance on serial 7's." (R. at 705.) She assessed Plaintiff with a GAF of 55, indicating moderate symptoms.[2] (R. at 707.) In the mental residual functional capacity assessment she completed on Plaintiff, Dr. Joseph checked that Plaintiff was markedly limited in her ability to sustain attention and concentration for extended periods (R. at 710); however, she also indicated that Plaintiff's concentration was moderately impaired (R. at 712). Accordingly, the undersigned finds that Dr. Joseph's opinion was internally inconsistent.

Dr. Joseph's opinion is also inconsistent with those of the state agency reviewing psychologists. On May 5, 2009, Mr. Legg noted that Plaintiff's concentration was only mildly

---

[2] A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers and coworkers). <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>"), 32 (4th ed. 1994) (emphasis in original).

deficient. (R. at 528.) Eight days later, Dr. Comer also indicated that Plaintiff had mild difficulties in maintaining concentration, persistence, or pace. (R. at 542.) Dr. Capage reviewed Dr. Comer's Psychiatric Review Technique and affirmed it on August 27, 2009. (R. at 579.)

In sum, Dr. Joseph's opinion is internally inconsistent and is contradicted by other persuasive evidence contained in the record. Therefore, the undersigned finds that substantial evidence supports the ALJ's assignment of little weight to this opinion.

## G. Appeals Council failure to remand regarding evidence of carpal tunnel syndrome and diagnosis of fibromyalgia

As her final argument for relief, Plaintiff contends that the Appeals Council erred by failing to remand her case to the ALJ for consideration of additional evidence regarding carpal tunnel syndrome and fibromyalgia. (Plaintiff's Brief at 7, 15.) Defendant asserts that this additional evidence would not have changed the ALJ's decision and that remand was therefore not necessary. (Defendant's Brief at 14-15.)

In Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council must consider additional evidence that was not submitted to the ALJ if the evidence is (1) new, (2) material, and (3) relates to the period on or before the date of the ALJ's decision. "New evidence is evidence which is not duplicable or cumulative. Evidence is 'material' if there is a reasonable possibility that it would have changed the outcome." Id. at 96. Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision. See Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

Carpal Tunnel Syndrome

The evidence submitted to the Appeals Council indicated that on February 24, 2011, P.A.

Harper noted that a nerve conduction study showed that Plaintiff was positive for bilateral carpal tunnel syndrome, right worse than left. (R. at 776-77.) On May 18, 2011, Dr. Topping performed a right carpal tunnel release on Plaintiff. (R. at 778.) On June 3, 2011, Plaintiff reported to P.A. Harper that she was "doing very well" and that her "numbness and tingling have completely resolved." (R. at 779.) Plaintiff had "full flexion extension of her fingers" and could "oppose her thumb to the base of her fourth metacarpal." (Id.) On July 14, 2011, Plaintiff reported to P.A. Little that, "for the most part[,] her hand [was] doing much better." (R. at 780.) P.A. Little indicated that Plaintiff's "symptoms have resolved as far as forearm pain and numbness." (Id.) The undersigned finds that ths evidence is not material, as there is no reasonable possibility that it would have changed the ALJ's conclusion that Plaintiff's carpal tunnel syndrome was not a disabling condition. See Wilkins, 953 F.2d at 96. Accordingly, the Appeals Council did not err by not remanding Plaintiff's case to the ALJ for consideration of this evidence.

Fibromyalgia

The evidence submitted to the Appeals Council indicated that on July 18, 2011, Dr. Kafka, a rheumatologist, conducted a consultative examination of Plaintiff for polymyalgias and polyerthralgias. (R. at 832.). Dr. Kafka's examination "reveal[ed] 17 or 18 positive fibromyalgia tender points" and noted that Plaintiff met the diagnostic criteria for fibromyalgia. (R. at 834-35.) On July 29, 2011, Plaintiff told P.A. Deaton that "Dr. Topping . . . stated she may have some possible fibromyalgia from the EMG test and . . . she [would] be treated for fibromyalgia by her rheumatologist for right now." (R. at 792.)

Plaintiff did not allege disability due to fibromyalgia, and so the ALJ never considered whether fibromyalgia should be included as one of her severe impairments. The evidence submitted

by Plaintiff to the Appeals Council does not establish that Plaintiff was disabled by fibromyalgia for the time period prior to the ALJ's decision. See Mitchell, 699 F.2d at 188. Given this, the undersigned finds that this evidence is not material to the issue before the ALJ. If anything, it could be used to buttress a new disability claim filed by Plaintiff asserting disability since July 2011.

To remand for consideration of the evidence regarding Plaintiff's fibromyalgia diagnosis is tantamount to allowing Plaintiff to prosecute a different and later disability claim based on the original disability claim filing date even though there is substantial evidence that Plaintiff was not disabled under her original claim. In other words, allowing remand would frustrate the appeal process. The appeal process's purpose is to determine whether the ALJ applied the correct law and did not abuse his or her discretion during the fact-finding process. See Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). The line is therefore drawn at the ALJ's decision. Furthermore, this so-called "new evidence" is simply irrelevant because it relates to the period after the ALJ's decision and not before. See 42 U.S.C. §§ 405(g) & 423(b); Willis v. Sec'y of Health & Human Servs., 727 F.2d 551, 554 (6th Cir. 1984). Accordingly, the undersigned finds no error in the Appeals Council's decision to not remand Plaintiff's case to the ALJ for consideration of this evidence.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _14_ day of January, 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE